UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------
IN RE:

     AGWAY, INC.                                                   CASE NO. 02-65872 through
                                                       02-65877
                                          Chapter 11
                       Debtor                              Jointly Administered
----------------------------------------------------------------
IN RE:

     AGWAY GENERAL AGENCY, INC.

                       Debtor
----------------------------------------------------------------
IN RE:

     BRUBAKER AGRONOMIC CONSULTING
     SERVICE LLC

                       Debtor
----------------------------------------------------------------
IN RE:

     COUNTRY BEST ADAMS, LLC

                       Debtor
----------------------------------------------------------------
IN RE:

     COUNTRY BEST-DEBERRY LLC

                       Debtor
----------------------------------------------------------------
IN RE:

     FEED COMMODITIES INTERNATIONAL
     LLC

                       Debtor
----------------------------------------------------------------

AGWAY LIQUIDATING TRUST

Plaintiff

vs.                                    ADV. PRO. NO. 04-80269

STANLEY J. BURKEHOLDER, DONALD
P. CARDARELLI, KEITH H. CARLISLE,
D. GILBERT CROUSER, JOHN R. COOK,
ANDREW J. GILBERT, THOMAS G. HARDY,
JOHN R. LIGO, ROBERT L. MARSHMAN,
JEFFREY B.MARTIN, SAMUEL F. MINOR,
PETER J. O'NEILL, MATT E. ROGERS,
RICHARD H. SKELLIE, CARL D. SMITH,
THOMAS E. SMITH, GARY K. VAN SLYKE,
JOEL L. WENGER, EDWIN C. WHITEHEAD,
DENNIS C. WOLFF, and WILLIAM W. YOUNG

Defendants

-------------------------------------------------------------
APPEARANCES:

WILMER CUTLER PICKERING HALE AND          PHILIP D. ANKER, ESQ.
        DORR, LLP                         Of Counsel
Attorneys for Movant/Defendants
399 Park Avenue
New York, New York 10022

HISCOCK & BARCLAY, LLP                    SUSAN R. KATZOFF, ESQ.
Attorneys for Movant/Defendants           Of Counsel
Financial Plaza
P.O. Box 4878
Syracuse, new York 13221-4878

STAMELL & SCHAGER, LLP                    JOHN C. CROW, ESQ.
Attorneys for Agway Liquidating Trustee   Of Counsel
One Liberty Plaza, 35th Floor
New York, NY 10006-1414


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

## MEMORANDUM-DECISION, FINDINGS OF FACT,
## AND RECOMMENDATION

Currently under consideration by the Court is a motion filed on April 29, 2005,[1] by

Stanley J. Burkeholder, Donald P. Cardarelli ("Cardarelli"), Keith H. Carlisle, D. Gilbert Couser,

John R. Cook, Andrew J. Gilbert, Thomas G. Hardy, John R. Ligo, Robert L. Marshman, Jeffrey

B. Martin, Samuel F. Minor, Peter J. O'Neill, Matt E. Rogers, Richard H. Skellie, Carl D. Smith,

Thomas E. Smith, Gary K. Van Slyke, Joel L. Wenger, Edwin C. Whitehead, Dennis C. Wolff

and William W. Young (the "Defendants").[2]   The motion seeks dismissal of a complaint

("Complaint") filed on behalf of the Agway Liquidating Trust ("Liquidating Trust" or "Plaintiff")

by D. Clark Ogle ("Liquidating Trustee") on November 19, 2004, pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), incorporated in Rule 7012 of the Federal

Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.").   Opposition to the motion was filed by the

Plaintiff on May 24, 2005.

The motion was heard by the Court at its regular motion term in Syracuse, New York, on

May 31, 2005.   Following oral argument, the Court afforded the parties an opportunity to file

memoranda of law.   The matter was originally submitted for decision on June 30, 2005.[3]

---

[1]   On April 4, 2005, the Court signed an Order approving a Stipulation which set a deadline of April 29, 2005, for the Defendants to either "move, answer or otherwise respond to the Complaint . . . ." (Docket No. 8).

[2]   The Defendants are alleged to be former directors and officers of Agway, Inc. ("Agway" or "Debtor").   Cardarelli was Agway's president and chief executive officer until he was terminated postpetition in April 2003.

[3]   By letter dated July 1, 2005, the Plaintiff requested that the Court disregard three arguments made on behalf of the Defendants in the memorandum of law, filed on June 30, 2005, which the Plaintiff asserted had not been raised previously.   By letter dated July 5,2005, counsel for the Defendants responded that they had, indeed, raised the arguments in their prior briefs, as well as at the May 31st hearing.   The Court responded on July 8, 2005, indicating that it would

4

Ultimately that date was extended to September 2, 2005.[4]


## JURISDICTIONAL STATEMENT


"Whenever a proceeding is brought in a bankruptcy court, there must be jurisdiction over each dispute within the proceeding." *In re Fisher*, 151 B.R. 895, 899 (Bankr. N.D. Ill. 1993). The  Court has the inherent power to raise the issue of its subject matter jurisdiction in any given proceeding before it.  *See In re Incor, Inc.*, 110 B.R. 790, 793 (Bankr. D. Md. 1989); *see also  In re Terracor*, 86 B.R. 671, 677 (D. Utah 1988) (indicating that it is within the court's purview to raise the question of subject matter jurisdiction *sua sponte*).  On August 11, 2005, the Court

not consider the defense of collateral estoppel in view of the fact that it had been raised for the first time in the Defendants' June 30th memorandum of law.  The Court concluded that the Defendants had previously raised the issue concerning whether the debt at issue could be recharacterized as equity and, accordingly, determined that it would consider that argument. Finally, the Court found that although the Defendants had not raised the business judgment rule as a defense to  Plaintiff's second cause of action prior to their submission of the June 30th memorandum of law, nevertheless, the Court has indicated that it would consider it on the basis that it "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *See* Court's Letter, dated July 8, 2005.

However, based upon a review of the case law, the Court concludes that "while the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company," it is inappropriate for the Court to rely on an affirmative defense such as the business judgment rule in considering a motion pursuant to Fed.R.Civ.P. 12(b)(6).  *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005); *see also In re Southeast Banking Corp.*, 827 F.Supp. 742, 754-55 (S.D. Fla.1993), rev'd in part on other grounds, 69 F.3d 1539 (11th Cir.1995) (indicating that any purported exercise of business judgment by the defendants is "a question of fact that should not be considered in a motion to dismiss").


[4] On August 22, 2005, the Court requested that the parties file supplemental memoranda of law on or before September 2, 2005, addressing the limited issue of the Court's jurisdiction to adjudicate the issues under consideration. *See* Court's Letter, dated August 11, 2005.

5

requested that the parties file supplemental memoranda of law on or before September 2, 2005,

addressing the limited issue of the Court's jurisdiction to adjudicate the issues under

consideration.  *See* Court's Letter, dated August 11, 2005.

The Court's subject matter jurisdiction is defined in 28 U.S.C. §§ 157 and 1334.  *See*

*Plaza at Latham Associates v. Citicorp North America, Inc.*, 150 B.R. 507, 510 (N.D.N.Y. 1993).

This Court has subject matter jurisdiction with respect to (1) cases "under title 11," (2) civil

proceedings "arising under title 11," (3) civil proceedings "arising in" a case under title 11 and

(4) civil proceedings "related to" a case under title 11.  *See* 28 U.S.C. § 157(a).  "Bankruptcy

judges *may hear and determine* all cases under title 11 and all core proceedings arising under title

11 . . . and may enter appropriate orders and judgments. . . ."  28 U.S.C. § 157(b)(1) (emphasis

added).

> A bankruptcy judge may also *hear* non-core proceedings that are otherwise related
> to a title 11 case.  In such a proceeding, however, the bankruptcy judge may not
> *determine* the issue, but may only submit proposed findings of fact and
> conclusions of law to the district court.

*In re Best Products Co., Inc.*, 68 F.3d 26, 30 (2d Cir. 1995), citing 28 U.S.C. § 157(c)(1).

Section 157(b)(3) authorizes the bankruptcy judge to make a determination whether a

proceeding is a "core" proceeding or otherwise "related to" the bankruptcy case.  In this regard,

a review of the legislative history of 28 U.S.C. § 157 supports the conclusion that Congress

intended "a broad interpretation of the parameters of a core proceeding."  *See id.* at 31, citing *In

re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d Cir.), *vacated sub nom. Insurance Co. of State of

Pennsylvania v. Ben Cooper, Inc.,* 498 U.S. 964 (1990), *reinstated*, 924 F.2d 36 (2d Cir. 1991).

The fact that the resolution of the matter may be impacted by state law does not prevent the

6

bankruptcy court from finding that it is a core matter. *See* 28 U.S.C. § 157(b)(3). Indeed, the

Second Circuit has made it clear that "bankruptcy courts are not precluded from adjudicating state

law claims when such claims are at the heart of the administration of the bankruptcy estate." *Ben*

*Cooper*, 896 F.2d at 1399.

Whether or not a proceeding is a "core" proceeding depends on the nature of the

proceeding if it is not one of those specifically listed in 28 U.S.C. 157(b)(2). *See In re Kings*

*Falls Power Corp.*, 185 B.R. 431, 438 (Bankr. N.D.N.Y. 1995), citing *In re S.G.Phillips*

*Constructors, Inc.*, 45 F.3d 702, 707 (2d Cir. 1995). The Court's main focus of inquiry must be

on whether the essence of the proceeding is "'at the core of the federal bankruptcy power.'" *S.G.*

*Phillips Constructors*, quoting *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,

458 U.S. 50 (1982).

The test of whether a proceeding is core is to ask whether it invokes a substantive right

provided by title 11 or by its nature could arise only in the context of a bankruptcy case. A cause

of action "arising under" title 11 is one involving a cause of action created or determined by a

statutory provision of the Bankruptcy Code. Proceedings "arising in" a bankruptcy case are those

that are not based on any right expressly created by title 11 but nevertheless would have no

existence outside of the bankruptcy. In this case, the causes of action alleged in the complaint are

not at the core of the Court's bankruptcy power. They do not arise under title 11 and would

certainly have existence outside of bankruptcy under state law.

Plaintiff makes the argument that it is a core proceeding in that the Court has been asked

to interpret its Order of Confirmation in connection with the Defendants' assertion of the defense

of res judicata. However, this is not a basis for the Court's determination concerning the extent

7

of its jurisdiction. *See In re Conseco, Inc.*, 318 B.R. 425, 428-432 (Bankr. N.D. Ill. 2004) (concluding that "the well-pleaded complaint rule should be applied in determining whether a [bankruptcy] court has jurisdiction pursuant to § 1334."). The Court concludes that the causes of action do not constitute a basis for finding the adversary proceeding to be core.

There remains the question of whether the Court has "related to" jurisdiction. The answer is complicated by the fact that the adversary proceeding was commenced on behalf of the Liquidating Trust postconfirmation. In that situation, the Court's "related to" jurisdiction has been found to diminish based on the premise that the bankruptcy estate no longer exists after confirmation of the plan. *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 166 (3d Cir. 2004); *see also In re Boston Reg'l Med. Ctr., Inc.* 410 F.3d 100, 106 (1st Cir. 2005) (noting that "[w]hile courts have interpreted the term 'related to' more grudgingly in some post-confirmation settings, context is important"); *Conseco*, 318 B.R. at 432 (pointing out that "[t]he extent of related jurisdiction is even more limited after confirmation of a Chapter 11 plan"). In addition, a confirmation order cannot confer jurisdiction upon a bankruptcy court unless it already exists pursuant to 28 U.S.C. § 1334 or 28 U.S.C. § 157. *In re Insilco Technologies, Inc.*, 330 B.R. 512, 519 (Bankr. D. Del. 2005). As pointed out by the court in *Resorts International*, the "essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id.* at 166-67.

In *Boston Regional*, the court emphasized the difference between a chapter 11 reorganization plan and a chapter 11 liquidating plan, pointing out that in the latter, "the reorganized debtor's sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Boston Regional*, 410 F.3d at 106. It has no interest in reentering

8

the marketplace, as in the case of a reorganization plan. Thus the "specter of endless bankruptcy

jurisdiction and a kindred concern about unfairly advantaging reorganized debtors" does not exist

in the context of a liquidation plan. *Id.* The court in *Boston Regional* concluded that "when a

debtor (or a trustee acting to the debtor's behoof) commences litigation designed to marshal the

debtor's assets for the benefit of its creditors pursuant to a liquidating plan of reorganization, the

compass of related to jurisdiction persists undiminished after plan confirmation." *Id.* at 107; *see*

*also In re AstroPower Liquidating Trust*, 335 B.R. 309, 324 (Bankr. D. Del. 2005) (distinguishing

*Resorts* and concluding that the claims were "linked to the debtor's prepetition losses and

entrusted to the plaintiff *via the Plan for the benefit of creditors"* (emphasis in original)).

According to the Liquidating Trust Agreement (Docket No. 5036), filed April 21, 2004,

"the Liquidating Trust [was] established for the sole purpose of liquidating its assets for the

benefit of the holders of the Allowed General Unsecured Claims . . . ." Pursuant to the

Liquidating Trust Agreement, the Trustee has

> the power to prosecute for the benefit of the Liquidating Trust all claims, rights,
> and causes of action transferred to the Liquidating Trust, whether such suits are
> brought in the name of the Liquidating Trust, the Debtors or otherwise for the
> benefit of the holders of beneficial interests in the Liquidating Trust.

*Id.* at § 4.2. In this case, the adversary proceeding is designed to marshal the Debtor's assets for

the benefit of the creditors pursuant to the liquidating plan approved by this Court on April 24,

2004, and has the potential for having a conceivable effect on the estate being administered by

the Liquidating Trustee. *See, generally, Cuyahoga Equip.*, 980 F.2d at 114; *In re Victory*

*Markets, Inc. v. NYS Unemployment Ins. (In re Victory Markets, Inc.)*, 263 B.R. 9, 15 (Bankr.

N.D.N.Y. 2000); *In re 610 W. 142 Owners Corp.*, 219 B.R. 363, 370-71 (Bankr. S.D.N.Y. 1998).

9

While the possibility for enhancement of the post-confirmation entity's assets, in and of itself, generally does not serve as a basis for finding "related to" jurisdiction (*see In re LGI, Inc.*, 322 B.R. 95, 106 n.16 (Bankr. D. N.J. 2005)), because the Liquidating Trust was given the power to prosecute the action under the terms of the Debtor's Plan and because it is a plan of liquidation, rather than reorganization, the Court concludes that there is a sufficient nexus to the plan to find that it has "related to" jurisdiction to consider the motion presently before it and to present a report and recommendation to the U.S. District Court for the Northern District of New York pursuant to 28 U.S.C. § 157(c)(1).  *See In re Blackwell ex rel. Estate of I.G. Services, Ltd.,* 279 B.R. 818, 824 (Bankr. W.D. Tex. 2002) (concluding that the motions to dismiss a complaint in the context of "related to" jurisdiction are appropriately considered by a bankruptcy court despite having to submit a report and recommendations to the district court).  Accordingly, the Court finds that it has non-core related to jurisdiction over the parties and subject matter of this adversary proceeding matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(3) and 157(c)(1).

## FACTS

The following facts are as alleged in the Complaint and do not constitute findings by the Court:

1.     Plaintiff, the Agway Liquidating Trust, was established by this Court's Order, dated April 28, 2004, confirming the Debtor's Second Amended Joint Plan of Liquidation, and is authorized to prosecute the claims set forth herein.  D. Clark Ogle was appointed the Trustee of the Liquidating Trust by order of this Court, dated April 28, 2004, and has directed the Liquidating

Trust to prosecute these claims through its counsel.  *Id.* at ¶ 3.

2.      Agway was an agricultural cooperative formed in 1964 that was headquartered in DeWitt,

New York. On October 12, 2002, Agway and several of its wholly-owned subsidiaries filed for

bankruptcy protection pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §

1101 et seq.  On April 28, 2004, Agway's Plan was confirmed, and liquidation of the estate

currently continues under the Trustee.  *Id.* at ¶ 15.

3.      Agway common shares could only be held by persons eligible to be members, i.e., owners

or operators of working farms, or an immediate family member.  As of the petition date, Agway's

members totaled approximately 69,000.  Agway members became members by purchasing a share

of Agway common stock at its $25 par value. As Agway disclosed:

> The Membership Common Stock, $25 par value, is held only by active Agway
> members. Ownership of Membership Common Stock is different from ownership
> of common stock in typical business corporations because Agway is an
> agricultural cooperative. Membership Common Stock may only be purchased by
> persons who qualify as Agway members and is transferrable only with Agway's
> consent. Membership Common Stock indicates membership in Agway rather than
> indicating a significant equity interest in Agway.

*Id.* at ¶ 17.

4.      Agway also issued four series of cumulative preferred shares: Series A $100 par value

held only by members; Series B $100 par value held by the Agway thrift plan; Series B-1 $100

par value held by the public; and Series HM $25 par value, held only by former Agway members.

The equity interest of preferred shareholders was limited to par value. Series A and B holdings

accounted for 96% of all preferred shareholdings.  *Id.* at ¶ 18.

5.      To generate cash it needed to fund capital expenditures and repay its debt, Agway steadily

increased its debt beginning in the 1990's through 2002. From 1990 to 2002, Agway's long-term

debt grew from approximately $156 million to $459 million and its subordinated debt grew from

approximately $267 million to $462 million. Between 1988 and 2001, Agway (directly and

through AFC, its financing subsidiary later merged into Agway in 2001) made several offerings

of subordinated debt in the form of subordinated debentures, and later subordinated money

market certificates and member subordinated money market certificates ("Member MMCs"), due

between October 1990 and October 2016. *Id.* at ¶ 24.

6.      Agway sold subordinated money market certificates primarily to its farmer-members.

Their maturities ranged from four to fifteen years, and their denominations ranged from $100 to

$5,000 and multiples thereof. The Member MMCs could only be purchased by Agway members

and could not be transferred to non-members, except by will. *Id.* at ¶ 25.

7.      Agway represented that its "traditional practice was to redeem certain money market

certificates on presentation with accrued interest, even though no payment of principal was due

under the terms of the certificates. All Member MMCs were subject to this redemption policy.

Agway stated in its public filings that it:

> . . . offers [through AFC] subordinated money market certificates (and previously
> offered subordinated debentures) to the public. AFCs subordinated debt is not
> redeemable by the holder, though AFC historically has had a practice of
> repurchasing at face value, plus interest accrued at the stated price, certain
> subordinated debt whenever presented for repurchase prior to maturity. However,
> AFC is under no obligation to repurchase such debt when so presented, and AFC
> may stop or suspend this repurchase practice at any time.

> Indeed, Agway redeemed certificates it had no obligation to repurchase, thereby depleting

the company of cash necessary to meet its loan covenants and other business obligations. *Id.* at

¶ 26.

8.      From 1998 to 2002, Agway maintained the following levels of subordinated debt, and

12

voluntarily redeemed subordinated debt in excess of the amount of subordinated debt on which

payment was due, as follows:

|  | (A) Total Subordinated Debt | (B) Currently Due Subordinated Debt | (C) Subordinated Debt Redemptions | (C-B) Early Debt Redemptions |
|---|---|---|---|---|
| 1998 | $462,196,000 | $75,589,000 | $ 94,302,000 | $ 18,713,000 |
| 1999 | $486,303,000 | $76,968,000 | $109,842,000 | $ 32,874,000 |
| 2000 | $474,874,000 | $57,125,000 | $143,001,000 | $ 85,876,000 |
| 2001 | $449,368,000 | $55,948,000 | $169,792,000 | $113,844,000 |
| 2002 | $425,366,000 | $36,917,000 | $103,172,000 | $ 66,255,000 |

*Id.* at ¶ 27.

9.      By the third quarter of 2000, Agway had sold its retail store business, several pipeline

terminal storage facilities, and its consumer products supply system, partly in order to service its

debt. *Id.* at ¶ 32.

10.      By June 2000, Agway's debt covenants required it to maintain at least $425 million in

preferred stock and subordinated debt. Although Agway stated, "[t]he required minimum level

of preferred stock and subordinated debt has historically been at levels that do not interfere with

the normal volume of requests Agway has received and fulfilled to repurchase such securities[,]"

it also cautioned that it might have to restrict its voluntary redemption practice, stating, "[i]n

addition, the terms or conditions of the line of credit discussed above, as ultimately negotiated,

may cause AFC to limit or cease its past practices with regard to the repurchase of subordinated

debt." *Id.* at ¶ 33.

11.      Notwithstanding its debt covenant violations, negative net earnings, and negative current

ratio, Agway continued to voluntarily redeem subordinated money market certificates through

2000. *Id.* at ¶ 34.

12.      In March 2001, the Board authorized the issuance of an additional $495 million in money market certificates.  *Id.* at ¶ 35.

13.      Also in March 2001, Agway replaced its senior debt with a new $175 million credit facility. The terms of this facility were even more restrictive than the one it replaced, for example, requiring Agway not to reduce preferred stock and subordinated debt below $455 million and $465 million, while also restricting redemptions of subordinated debt.  *Id.* at ¶ 36.

14.      By June 2001, Agway was still in violation of its loan covenants. It agreed, *inter alia*, to pledge its ownership interest in its largest and most profitable operating subsidiary, Telmark (its leasing subsidiary), and to maintain at least $465 million (rather than $455 million) in preferred stock and subordinated debt as conditions to obtain a waiver of the covenant violations. *Id.* at ¶ 37.

15.      Beginning in August, 2001, Cardarelli began formulating a 3-year plan to deal with Agway's financial distress, which he presented at Agway's October 2001 annual meeting. The key to Cardarelli's plan was to raise cash by selling Telmark and several other businesses.  *Id.* at ¶ 38.

16.      Notwithstanding the steps taken and its debt covenant violations, negative net earnings, and negative current ratio, Agway continued to voluntarily redeem the Member MMCs through 2001, although it had no obligation to do so. In fact, voluntary redemptions of subordinated debt reached an all time high in 2001 of $113.8 million, in addition to payment of $55.8 million on certificates that were due. *Id.* at ¶ 39.

17.      Agway announced on March 6, 2002, that it would suspend sales of its securities, including subordinated money market certificates:

The anticipated financial impact of our [divestiture] plan will be more fully described in the quarterly report we will file with the Securities and Exchange Commission for the quarter ending March 31, 2002. We will temporarily stop selling our Agway Securities to the public until we file this report.

*Id.* at 42.

18.    At the June 2002 board meeting, upon presentation by Cardarelli, the Agway board

suspended repurchase of Agway securities, with the following resolutions, *inter alia*:

**RESOLVED,** That the President, Senior Vice President and Chief Financial Officer, and the Senior Vice President and General Counsel for the Company may, after consultation with its legal and other advisors, cease Agway's historical practice of repurchasing its securities to avoid breaching financial covenants that Agway has in its agreements with lenders or to avoid the violation of any legal requirements applicable to the sale or repurchase of Agway's securities; and be it

**FURTHER RESOLVED**, That the President, Senior Vice President and Chief Financial Officer, and the Senior Vice President and General Counsel of the Company, may reinstitute the repurchase practice at such time that it is determined that repurchases will no longer lead to a breach of any financial covenants under agreements with the Company's lenders or applicable legal requirements; . . .

*Id.* at ¶ 46.

19.    In a June 17, 2002 8-K statement, Agway finally announced the suspension of voluntary

redemptions explaining:

The primary reason for the Board's decision to suspend the Company's repurchase of eligible Agway Inc. subordinated debentures and Agway Inc. preferred stock is to preserve the Company's liquidity during the implementation phase of its planned divestiture of certain business operations (discussed below) and to provide the Company with greater flexibility in the event those divestitures do not go as planned. In addition, because the Company is not currently actively raising capital through new sales of securities, the Board determined that suspending the Company's repurchase practice would become necessary in the near future in order to allow the Company to satisfy its obligation under the Credit Agreement to maintain a minimum balance, ranging from $440 million to $450 million throughout the year, of preferred stock, subordinated debt and certain other interest-bearing debt outstanding. As of June 14, 2002, the Company had

approximately $459 million of preferred stock, subordinated debentures and other interest bearing debt outstanding.

*Id.* at ¶ 47.

20.    In addition, Agway's 2002 10-K statement contained a going concern statement that made

the following disclosures:

> As reported in our periodic reports, in recent years cash flow from operations for Agway Inc. and certain of its business segments and subsidiaries has been supplemented by external borrowings and the sale of both discontinued business operations and other assets, in order to meet the cash requirements for capital improvements, scheduled debt repayments, and maintenance of a voluntary repurchase practice with regard to Agway securities.
>
> As previously reported, we have violated the financial covenants contained in that agreement a number of times since its origination, principally due to insufficient earnings. As previously reported, based on Agway's June 30, 2001, financial results, Agway was in violation of certain financial covenants within its Credit Agreement.

*Id.* at ¶ 48.

21.    Until the June 2002 suspension, Agway had voluntarily redeemed $66.3 million in

subordinated debt in 2002, notwithstanding its continuing loan covenant violations and its

precarious financial condition, although it had no obligation to do so.  *Id.* at ¶ 49.

22.    According to public filings, from 1998 to 2002, Agway's total liabilities, total assets, net

assets, capital stock and surplus were as follows:

|  | Total Assets | Total Liabilities | Net Assets | Capital Stock | Surplus |
|---|---|---|---|---|---|
| 1998 | $1,418,321,000 | $1,211,393,000 | $206,928,000 | $50,442,000 | $156,486,000 |
| 1999 | $1,437,172,000 | $1,238,225,000 | $198,947,000 | $45,423,000 | $153,524,000 |
| 2000 | $1,572,659,000 | $1,390,968,000 | $181,691,000 | $42,168,000 | $139,523,000 |
| 2001 | $1,642,797,000 | $1,473,467,000 | $169,330,000 | $40,048,000` | $129,282,000 |
| 2002 | $1,574,360,000 | $1,510,258,000 | $64,102,000 | $34,470,000 | $ 29,632,000 |

16

*Id.* at ¶ 51.

23.      According to public filings, from 1998 to 2002, Agway redeemed the following amounts

of common stock and preferred stock, and paid the following amounts of dividends on common

and preferred stock:

|  | Common Stock Redeemed | Preferred Stock Redeemed | Dividends Paid | Total Dividends and Redemptions |
|---|---|---|---|---|
| 1998 | $68,000 | $9,670,000 | $3,634,000 | $13,372,000 |
| 1999 | $65,000 | $4,954,000 | $3,394,000 | $ 8,413,000 |
| 2000 | $33,000 | $3,222,000 | $3,165,000 | $ 6,420,000 |
| 2001 | $33,000 | $2,092,000 | $2,951,000 | $ 5,076,000 |
| 2002 | $32,000 | $5,578,000 | $2,659,000 | $ 8,269,000 |

*Id.* at ¶ 52

24.      From 1998 to 2002 the total amount of subordinated debt redemptions, stock

redemptions, and stock dividends were as follows:

|  | Stock Dividends and Stock Redemptions | Redemptions in Excess of Current Subordinated Debt | Total |
|---|---|---|---|
| 1998 | $13,372,000 | $ 18,713,000 | $ 32,085,000 |
| 1999 | $ 8,413,000 | $ 32,874,000 | $ 41,287,000 |
| 2000 | $ 6,420,000 | $ 85,876,000 | $ 92,296,000 |
| 2001 | $ 5,076,000 | $113,844,000 | $118,920,000 |
| 2002 | $ 8,269,000 | $ 66,255,000 | $ 74,524,000 |

*Id.* at ¶ 53.

25.      From 1998 to 2002, total subordinated debt redemptions, stock redemptions, and

stock dividends compared to net earnings and to surplus were as follows:

| | Total Dividends and Redemptions | Surplus | Net Earnings |
|---|---|---|---|
| 1998 | $ 32,085,000 | $156,486,000 | $1,145,000 |
| 1999 | $ 41,287,000 | $153,524,000 | $1,795,000 |
| 2000 | $ 92,296,000 | $139,523,000 | ($ 9,377,000) |
| 2001 | $118,920,000 | $129,282,000 | ($ 8,927,000) |
| 2002 | $74,524,000 | $ 29,632,000 | ($98,247,000) |

*Id.* at ¶ 54.

Based on these allegations, Plaintiff asserts three causes of action. In the first cause of action, the Plaintiff takes the position that because the Member MMCs could only be purchased by Agway members, their purchase was "effectively an equity investment in Agway and Agway's voluntary redemption of these certificates represented both a drain on the company's cash and distribution of cash to its members." *Id.* at 55. The same argument is asserted with respect to the Series A preferred shares of stock in Agway, as well as the common stock redemptions and dividends. *Id.* at 56-57. On this basis, Plaintiff contends that "[t]he voluntary redemption of subordinated debt in excess of the current amount due, redemption of preferred and common stock redemptions [*sic*] and dividends, together totaling $74.5 million in 2002, violated DEL. CODE ANN. tit. 8, § 170 as illegal dividends because they exceed[ed] both surplus and net earnings." *Id.* at 57. On that basis, the Plaintiff contends that the Defendants are jointly and severally liable in the amount of $74,524,000.

Plaintiff's second cause of action asserts that the Defendants violated their duty of care by "declaring dividends and failing to suspend and/or allow the voluntary redemptions of subordinated money market certificates when Agway was unable to pay its debts as they became due." *Id.* at 62.

18

The third cause of action is based on allegations of corporate waste as a result of the practice of allowing voluntary redemptions in excess of current amounts due, which Plaintiff contends caused a drain on necessary cash.  *Id.* at 68.


## ARGUMENTS


The Defendants contend that res judicata and judicial estoppel prevent the Plaintiff from asserting a claim against them under Delaware corporation law[5] based on the Plan's classification of the Member MMCs as general unsecured debt.  It is the Defendants' position that DEL. CODE ANN. tit. 8, § 170, on which the Plaintiff relies, allows for the payment of "dividends upon shares of []capital stock, or to its members if the corporation is a nonstock corporation, either (1) out of its surplus . . . or (2) in case there shall be no such surplus, out of its net profits . . . ."  Defendants contend that DEL. CODE ANN. tit. 8, § 170 does not apply to the payment of debt.

Plaintiff acknowledges that the Member MMC's were treated by Agway as debt and appropriately provided for as such in Agway's Plan.  However, the Plaintiff argues that the Court should focus on the nature of the transactions which occurred prior to the suspension of the voluntary redemption practice by the Defendants in June 2002 of preferred stock and subordinated debentures, as well as the Member MMCs.  Plaintiff contends that the economic substance of the transactions involved the payment of "dividends" for purposes of the statute because the payments constituted the distribution of Agway's cash to its owners.

---

[5] Neither party disputes that the Complaint is governed by Delaware law based on the fact that Agway was incorporated in Delaware.  *See Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir. 2005) ("*Pereira III*").

19

The Plaintiff also contends that the Defendants violated their fiduciary duty to Agway by failing to halt the voluntary Member MMC redemptions earlier at a time when "(a) the company was violating its loan convenants, (b) was losing money, (c) its net current assets were negative, (d) the company was forced to sell assets to pay both senior and subordinated debt and (e) when it was not required to redeem Member MMCs that were not due."  Plaintiff's Memorandum in Opposition to Defendants' Motion, filed May 24, 2005, at 12.  In response, the Defendants argue that "it is hardly a breach of fiduciary duty for directors to continue a 'traditional' corporate practice to permit creditors to redeem their debentures and certificates upon presentation."  Defendants' Supplemental Memorandum of Law, filed June 30, 2005, at 9.

With respect to the cause of action based on alleged corporate waste, the Defendants assert that there is no legal support for the proposition that "the failure of a corporation's directors to cease repayment of its own valid debts - whether at or before maturity - constitutes corporate waste or a breach of fiduciary duty." *Id.* at 10.  However, the Plaintiff asserts that if the payments had not been made, millions of dollars would have been available to all of Agway's creditors. *See* Plaintiff's Opposition, filed May 24, 2005, at 14.  The Plaintiff contends that "it was improper and unnecessary to pay the money to the members when Agway could not meet its debt covenants or pay its debts." *Id.* at 15.

## DISCUSSION

In considering a motion pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept all of the Plaintiff's allegations as true, and will grant the motion to dismiss "only if it is clear no relief

20

could be granted under any set of facts that can be proved consistent with the allegations."
*Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984).  The Court is not only to accept Plaintiff's
allegations of fact as true, it is also to draw all reasonable inferences as may be drawn from those
facts in favor of the Plaintiff.  *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d. Cir. 1994);
*Steward v. Jackson & Nash*, 976 F.2d 86, 87 (2d. Cir. 1992); *Cosmas v. Hassett*, 886 F.2d 8, 11
(2d Cir. 1989).  The issue is not whether the Plaintiff will ultimately prevail but whether it is
entitled to offer evidence to support its claims.  *Hishon*, 467 U.S. at 73.  The motion is only to
be granted if "'it is clear that no relief could be granted under any set of facts that could be proved
consistent with the allegations.'" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir.
2001), quoting *Hishon*, 467 U.S. at 73.

        In this case, the Defendants seek dismissal of the Plaintiff's first cause of action, which
is based on Del. Code Ann. tit. 8, § 170.  It is the Defendants' position that by Plaintiff's own
admission, Agway's payment of stock dividends and stock redemption between 1998 and 2002
never exceeded the company's surplus.  Instead, the Defendants assert, Plaintiff has included the
redemption of the Member MMCs and subordinated debenture redemptions in the category of
"dividends" in arguing that the sum total paid exceeded the surplus in 2002 and, therefore, were
in violation of the statute.

        Defendants argue that it is inappropriate to construe the payments before maturity of the
Member MMCs and debentures as the payment of dividends.  Rather, Defendants contend that
they constituted a payment of a corporate debt.  In this regard, the Defendants argue that res
judicata should prevent the Court from finding otherwise.  The Defendants assert that the Plaintiff
should be barred from now arguing that the same subordinated debt securities represent equity

for which various individuals, holding the Member MMC's and the subordinated debentures, received payment from Agway through June 2002.

Their position rests in large part on the fact that Agway's Plan categorized "any Agway Subordinated Debt Securities Claim" as a "General Unsecured Claim" for purposes of treatment of Class 4(c).  *See* Second Amended Joint Plan of Liquidation at Art. I, § 1.51 and § 5.06. "Agway Subordinated Debt Securities" are further defined in the Debtor's Plan as "those certain unsecured subordinated debt securities, subordinated member debt securities and subordinated debentures issued from time-to-time by Agway and its predecessors, but shall not include any Section 510(b) Claims relating to Agway subordinated securities."  *Id.* at § 1.06.  Furthermore, "Agway Subordinated Debt Securities Claim" "means a Claim[6] arising on account of Agway Subordinated Debt Securities, including any interest accrued and owing thereon as of September 30, 2002." *Id.* at § 1.07.

The doctrine of res judicata or claim preclusion bars parties or their privies from relitigating issues that were or could have been raised in a prior action for which a final judgment was issued.  *See U.S. v. Envicon Dev. Corp.,* 153 F.Supp.2d 114, 123 (D.Conn. 2001).

> In the context of a prior bankruptcy reorganization confirmation, "[t]o determine whether the doctrine of res judicata bars a subsequent action, [the court must] consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." *Corbett v. MacDonald Moving Servs.*, 124 F.3d 82, 87-88 (2d Cir.1997). "In the bankruptcy context, [the court must] ask as well whether an independent judgment in a separate proceeding would impair,

---

[6]  "Claim" is defined at § 101(5) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code"),  as (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ." 11 U.S.C. § 101(5)(A).  "Debt" is separately defined as "liability on a claim."  11 U.S.C. § 101(12)

destroy, challenge, or invalidate the enforceability or effectiveness of the reorganization plan." *Id.* at 88 (quoting *Sure-Snap Corp. v. State Street Bank and Trust Co.,* 948 F.2d 869, 875-76 (2d Cir. 1991).

*Envicon Dev. Corp.*, 153 F.Supp.2d at 123-24.

The Order confirming the Debtor's Plan, dated April 28, 2004, constitutes a final judgment on the merits and res judicata applies to it with respect to any issues raised or that could have been raised during the confirmation proceedings. *In re G-P Plastics, Inc.*, 320 B.R. 861, 865 (Bankr. E.D. Mich. 2005); *In re USN Commc'ns, Inc.*, 280 B.R. 573, 586 (Bankr. D. Del. 2002). The question is whether the issues "raised or that could have been raised during the confirmation proceedings" are the same issues raised in the Plaintiff's Complaint.

The Court must agree with the Plaintiff that the doctrine of res judicata does not apply to the  position it now takes in the Complaint.  The confirmation proceedings addressed the treatment of claims that existed at the time the Debtor's petition was filed, including those identified as "Agway Subordinated Debt Securities" claims, which were included in Class 4(c) as general unsecured claims.  The proceedings did not address the payment to members which occurred prior to June 2002 as part of the voluntary redemption practice of Agway.  The prepetition redemption of the Member MMC's, as well as the subordinated debentures, of course, eliminated any future right to payment those members might have had, which would have served as a basis for asserting a claim in the Debtor's bankruptcy.  Accordingly, res judicata does not preclude the Plaintiff from taking its current position that their redemption prepetition constituted payment of dividends, rather than corporate debt.

Defendants also seek dismissal of the first cause of action based on judicial estoppel. "'The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding

that is inconsistent with a claim taken by that party in a previous proceeding.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.30, p. 134-62 (3d ed. 2000). For the same reasons discussed above, the Court concludes that the Plaintiff's claim, as asserted in its first cause of action, is not inconsistent with the position taken by the Debtor in connection with confirmation of its plan.

Thus, the Court must determine whether the Plaintiff is entitled to offer evidence to support its claims based on DEL. CODE ANN. tit. 8, § 170. As noted above, the Plaintiff asserts that the Court should examine the economic substance of the transactions, which Plaintiff contends merely distributed Agway's cash to its owners. The Plaintiff asserts that the purpose of DEL. CODE ANN. tit. 8, § 170 is to preserve a company's capital for the payment of debt. In support of this assertion, Plaintiff cites to *In re Buckhead America Corp.*, 178 B.R. 956, 972 (D.Del. 1994), which examined what the legislature intended in enacting § 170 in deciding whether to apply the statute to the facts before the Delaware state court. The court in *Buckhead* examined the possibility that the long-term financing of $175 million by Days Inn of America, Inc.("DIA"), a subsidiary of Days Inn of America Corp. ("DIC"), in order to purchase DIC's outstanding stock, might be considered an unlawful dividend payment to its sole shareholder, DIC. *Id.* at 973-74. The court, however, came to no definitive conclusion on that issue and merely denied defendants' motion to dismiss that particular claim because it was awaiting "further briefing and further development of the factual record." *Id.* at 974.

This Court does not believe it is necessary for there to be further development of a factual record in connection with this portion of Defendant's motion. According to BLACK'S LAW DICTIONARY, "debt security" is defined as "[a] security representing funds borrowed by the

24

corporation from the holder of the debt obligation; esp. a bond, note or debenture.  Generally a

debt security is any security that is not an equity security." BLACK'S LAW DICTIONARY 1385 (8th

ed. 2004).  This is to be compared with "equity security," which is defined as "[a] security

representing an ownership interest in a corporation, such as a share of stock, rather than a debt

interest, such as a bond, any stock or similar security, or any security that is convertible into stock

or similar security or carrying a warrant or right to subscribe to or purchase stock or a similar

security, and any such warrant or right."  *Id.*  In this case, Agway's Plan made reference to the

obligations as "subordinated debt securities," not "equity securities."

In addition, the Court notes that Delaware Corporation law does not define "dividend."

However, the dictionary defines it as "[a] portion of a company's earnings or profits distributed

pro rata to its shareholders, usu. in the form of cash or additional shares."  BLACK'S LAW

DICTIONARY 512 (8th ed. 2004).  In *Buckhead,* DIC was the sole shareholder of DIA.

Accordingly, any earnings or profits would have been distributed to only one entity, namely, DIC.

In *Crowthers McCall Pattern, Inc. v. Lewis (In re Crowthers McCall Pattern, Inc.)*, 129

B.R. 992 (S.D.N.Y. 1991), a case also cited by the Plaintiff, the court examined the economic

substance of certain transactions in connection with a leveraged buyout in which the additional

debt was assumed by the debtor in funding the purchase of stock owned by TLC Group, Inc. and

other individuals in a company known as TLC Pattern, Inc.  *Id.* at 1001.  In that case, the plaintiff

argued that the payments received by the defendants in connection with the sale of TLC Pattern,

Inc. should be characterized "in substance" as dividends or distributions made by TLC Pattern,

Inc.  *Id.*  In *Crowthers* all of the shareholders received payments.

However, the payments made by Agway in connection with its redemption or purchase

25

of the Member MMC's and the subordinated debentures prior to June 2002 was not done on a pro rata basis to <u>all</u> its members.  Rather, payment was made by Agway on an individual basis based upon presentation by a member of his/her money market certificate(s) or debentures, whether they had matured or not.  They were not payments made "across the board" to all members holding money market certificates and debentures.  Thus, it would appear that the payments were not dividends, as defined in the dictionary, and merely represent repayment of debt.

Accordingly, the Court must conclude that Defendants' motion seeking dismissal of Plaintiff's first cause of action should be granted based on the conclusion that the redemption of the Member MMC's and subordinated debentures did not constitute a payment of a dividend.  By Plaintiff's own admission, payments of dividends, as well as redemption of preferred and common stock, did not exceed surplus in the years from 1998-2002.  *Compare* ¶ 51 and ¶ 52 of the Complaint.

With respect to the its second cause of action, Plaintiff asserts that the Defendants breached their fiduciary duty of care.[78]  Defendants assert that even if that were true, Plaintiff

---

[7]  Neither party has indicated whether Agway's certificate of incorporation contains a provision eliminating or limiting the personal liability of directors to the corporation or its stockholders for monetary damages for breach of their fiduciary duty of care as permitted by DEL. CODE ANN. tit. 8 § 102(b)(7).  *See Pereira III* at 341.

[8]  Defendants assert that the "Plaintiff's claim for breach of fiduciary duty is also time-barred at least to the extent it is based upon debt repayments made or dividends issued prior to November 19, 2001," based on the Delaware three-year statute of limitations under 10 Del. Code § 8106.  *See* Defendants' Motion at 14, n. 9.  However, "a federal court exercising its 'related to' bankruptcy jurisdiction over state law claims applies the choice of law rules of the forum state in order to determine the applicable statute of limitations."  *See Pereira v. Cogan*, Case No. 000 CIV. 619, 2001 WL 243537, at *17 (S.D.N.Y. March 8, 2001) ("*Pereira I*").  Thus, under New York's choice of law rule for statutes of limitation, where an entity is suing "as a representative of the estate of a bankrupt corporation, it is the residency of the corporation that is applicable."  *Id.*  The residence of a corporation for purposes of New York's "borrowing statute" is the

cannot demonstrate that the repayment of the subordinated debt caused harm to Agway or its stockholders.  It is the Defendants' position that the redemptions of the Member MMC, in particular, represented repayment of legitimate obligations of the Debtors, i.e. the repayment of valid debt which must be paid before providing any return to equity holders.  *See* Defendants' Motion at 13.  With respect to creditors of the Debtors, Defendants assert that if Agway had ceased redeeming the debentures and certificates earlier than it did, there is a question whether this would have resulted in additional monies being available to pay unsecured creditors since 90% of the general unsecured claims were for repayment of the debentures and money market certificates.  *See* Defendants' Supplemental Memorandum, filed June 30, 2005 at 11.

Nowhere in the Complaint is there an indication concerning whether the allegations in the Complaint are based on a duty of care owed to the corporation and its stockholders or one based on its duty to creditors.  The Court does note that according to the Liquidating Trust Agreement (Docket No. 5036), filed April 21, 2004, "the Liquidating Trust [was] established for the sole purpose of liquidating its assets for the benefit of the holders of the Allowed General Unsecured Claims . . . ."  Pursuant to the Liquidating Trust Agreement, the Trustee has

> the power to prosecute for the benefit of the Liquidating Trust all claims, rights, and causes of action transferred to the Liquidating Trust, whether such suits are brought in the name of the Liquidating Trust, the Debtors or otherwise for the benefit of the holders of beneficial interests in the Liquidating Trust.

*Id.* at § 4.2.

Thus, it would appear from the language of the Liquidating Trust Agreement that the

corporation's principal place of business, which in this case is in New York.  Accordingly New York's six-year statute of limitations would apply to a cause of action based on breach of fiduciary duty.  *Id.* at *18.

action is brought on behalf of both the corporation and, more importantly, the unsecured creditors.

With respect to the latter, "[u]nder Delaware law, the fiduciary duty owed to creditors arises at

a point short of actual insolvency, that is, when the corporation is 'in the vicinity of insolvency.'"

*Pereira I* at *8 (citations omitted); *see also Healthco Int'l, Inc. v. Hicks, Muse & Co., Inc.*, 208

B.R. 288, 300 (Bankr D. Mass. 1997) (noting that "directors breach their fiduciary obligations

when they authorize a transaction which prejudices creditors").  However, as pointed out by the

court in *Pereira III*, the duties owed to creditors by the officers and directors "do not expand the

circumscribed rights of the trustee,[9] who may only assert claims of the bankrupt corporation, not

its creditors."  *Pereira III* at 342.

> In establishing a breach of fiduciary duty, it is important to note that

> "[m]ost of the decisions that a corporation, acting through its human agents,
> makes are, of course, not the subject of director attention.  Legally the board itself
> will be required only to authorize the most significant acts or transactions:
> mergers, changes in capital structure, fundamental changes in business,
> appointment and compensation of the CEO, etc. . . . ordinary business decisions
> that are made by officers and employees deeper in the interior of the organization
> can, however, vitally affect the welfare of the corporation and its ability to achieve
> its various strategic and financial goals . . . ."

*Pereira v. Cogan*, 294 B.R. 449, 530 (S.D.N.Y. 2003) ("*Pereira II*"), *vacated on other grounds*

*and remanded sub nom. Pereira v. Farace,* 413 F.3d 330 (2d Cir. 2005), quoting *In re Caremark*

*Int'l Inc. Deriv. Litig.,*698 A.2d 959, 968 (Del. Ch. 1996).  Directors may be found to have

breached their fiduciary duty of care if it is established that they failed to keep themselves fully

informed before voting, or if it is established that they were inattentive to their obligations and

---

[9]  The Liquidating Trust has the same standing as the trustee in the bankruptcy context to
allege breach of fiduciary duty claims.  *See In re Adelphia Commc'ns Corp.*, 322 B.R. 509, 529
(Bankr. S.D.N.Y. 2005) (*dicta*).

28

demonstrated a "'blindness to problems that later caused substantial harm . . . .'" *Pereira I* at *13, quoting American Law Institute, *Principles of Corporate Governance: Analysis and Recommendations*, § 401 at 155 (1994); *see also Healthco Int'l*, 208 B.R. at 305 (noting that the duty of care includes a duty of directors "'to inform themselves, prior to making a business decision, of all material information reasonably available to them'") (quoting ERNEST L. FOLK III, ET AL., FOLK ON DELAWARE GENERAL CORPORATION LAW, A COMMENTARY AND ANALYSIS § 141.21 (3d ed. 1992). Obviously, these are factual determinations that warrant denial of the Defendants' motion to dismiss the second cause of action to the extent that it alleges that the failure to suspend the voluntary redemptions of Member MMCs and subordinated debentures, as well as the redemption of preferred and common stock, at a time when Agway was unable to pay its debts, constituted a violation of the Defendants' duty of care. Plaintiff should be afforded an opportunity to establish that there was a breach of Defendants' fiduciary duty and that damages ensued as a result.

Whether or not a transaction constitutes corporate waste depends on whether the transfers or payments in connection with the redemptions served no corporate purpose or were for no consideration. *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997). As the court in *Vogelstein* noted, "[i]f, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste . . . ." *Id.* Keeping in mind that the standard for dismissal does not require the Court to determine that the Plaintiff ultimately will prevail, the Court finds no basis to dismiss Plaintiff's third cause of action. Plaintiff should have the opportunity to offer evidence to support its claim of corporate waste by Defendants in allowing

the voluntary redemptions of Member MMCs, subordinated debentures and preferred and common stock, i.e that the transactions were for no legitimate corporate purpose.

Based on the foregoing, it is hereby

RECOMMENDED to the U.S. District Court for the Northern District of New York that

(1) Defendants' motion seeking dismissal of the Plaintiff's first cause of action based on DEL. CODE ANN. tit. 8, § 170 be granted; and that

(2) Defendants' motion seeking dismissal of the Plaintiff's second and third causes of action based on allegations of breach of fiduciary duty of care and on allegations of corporate waste, respectively, be denied.


Dated at Utica, New York

this 6th day of March 2006


                                        s/s Stephen D. Gerling
                                        STEPHEN D. GERLING
                                        Chief U.S. Bankruptcy Judge